UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                        :

IQ DENTAL SUPPLY, INC.,            :
                        :

                    Plaintiff,     :  **<u>MEMORANDUM DECISION AND</u>**
                        :  **<u>ORDER</u>**
       - against -       :
                        :  17-cv-4834 (BMC)
HENRY SCHEIN, INC., PATTERSON   :
COMPANIES, INC., BENCO DENTAL   :
SUPPLY COMPANY,             :
                Defendants.  :
                        :
-------------------------------------------------------- X

**COGAN**, District Judge.

      IQ Dental Supply, Inc. ("IQ") brings this suit against Henry Schein, Inc. ("Schein"),

Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco"). IQ

alleges that defendants – dental supply distributors – have engaged in an ongoing antitrust

conspiracy by boycotting and attempting to destroy an online distribution platform run by a non-

party, SourceOne Dental ("SourceOne") through which IQ sells dental products to dentists. IQ

alleges unreasonable restraint of trade under the Sherman Act and corresponding state laws, as

well as state common law claims for tortious interference with prospective business relations,

civil conspiracy, and aiding and abetting.

      The case is before me on defendants' motion to dismiss. For the reasons explained

below, the motion is granted.

**BACKGROUND**

      The facts described below are taken from plaintiff's pleadings and are presumed to be

true for purposes of this motion.

IQ is a nation-wide distributor of dental supplies and equipment. IQ buys products from manufacturers and stores them in warehouses prior to their resale. Defendants are major distributors of dental supplies that together account for 80-90% of the relevant market (Schein 41%, Patterson 34%, Benco 10%). Defendants sell directly to dentists. Defendants do so primarily through on-the-ground regional sales representatives. In the United States, dental supplies and equipment are a $10 billion market. On average, dental practices use 100 or more different types of dental supplies on a monthly basis. Because consumer dentists can "one-stop-shop" with distributors, the vast majority of dental supplies and equipment are sold by manufacturers to wholesale distributors for reasons of efficiency, which in turn resell those supplies and equipment to dental professionals.

SourceOne, not a party to this suit, operates an "online distribution platform" through a series of e-commerce websites. Suppliers, such as IQ, sell dental supplies to dentists through those platforms. In addition to its own branded site, SourceOne operates state-specific websites in conjunction with state dental associations ("SDAs"). SourceOne does not supply or sell the products on its platforms; instead, it provides a mechanism for suppliers and dentists to interface. Suppliers who sell through SourceOne conduct transactions, fill orders, and ship the sold products directly to consumers. The suppliers then pay SourceOne a commission on each sale made through SourceOne's websites, and remit a commission to the SDAs for sales made on the state-specific sites. IQ claims that SourceOne offered dentists lower prices than those available through the traditional sales model employed by defendants.

The first SDA SourceOne site launched was sponsored by the Texas Dental Association (the "TDA") in October 2013, and was branded as "TDA Perks Supplies." It was followed

shortly thereafter by websites sponsored by the Arizona Dental Association (the "AZDA") and the Nevada Dental Association.

IQ alleges that defendants saw SourceOne as a threat to their long-standing market position. In response, IQ claims that defendants engaged in coordinated anticompetitive conduct to drive SourceOne from the market. This conduct allegedly took three forms: first, IQ alleges that defendants pressured dental product manufacturers not to sell to IQ or through the SourceOne websites. Second, IQ alleges that defendants coordinated and agreed to threaten and implement boycotts of SDAs that worked with SourceOne. Third, IQ alleges that defendants boycotted dentists who purchased dental supplies through SourceOne websites.

As to the first prong of the conspiracy, IQ claims that defendants pressured manufacturers supplying distributors who sold through the SourceOne sites, with the ultimate aim of depriving SourceOne of products to list on its sites and consequently driving it out of business. Defendants, IQ alleges, could pressure the manufacturers by threatening them with the loss of their business if the manufacturers continued to sell to distributors who worked with SourceOne.

Initially, two suppliers, DDS and Arnold, provided the bulk of the products available on the TDA and AZDA SourceOne websites. IQ alleges that because of the success of defendants' alleged anticompetitive efforts, by April 2014, manufacturers had stopped selling to DDS and Arnold, and SourceOne's websites had lost access to thousands of supplies, including at least 75% of their formerly top-selling products.

For example, IQ alleges that DMG America, a dental manufacturer, withdrew permission for its products to be sold through SourceOne sites under pressure from Schein and Patterson. As a result of manufacturer withdrawals, and as defendants' allegedly intended, DDS and Arnold yielded to defendants' pressure and ended their relationships with SourceOne. IQ claims that a

prospective replacement supplier, DHP Dental, told SourceOne that it was deterred from selling through SourceOne's websites after hearing about defendants' alleged boycott from dental manufacturers.  In May 2014, after DDS and Arnold terminated their relationships with SourceOne, IQ signed a contract with SourceOne to offer dental supplies for sale to dentists through SourceOne's websites.

In its complaint, IQ provides four examples of defendants' alleged direct pressure on manufacturers to boycott IQ:

- In 2011, representatives from a Danaher Corporation subsidiary manufacturer called IQ about an incident when IQ sold a product to a buyer, who then attempted to sell the product overseas.  IQ suspected that Danaher was looking for a reason to pull out of doing business with IQ – which it eventually did – and that this happened due to pressure from Schein.

- In March 2015, a representative from Tuttnauer, a dental manufacturer, advised IQ that if IQ continued selling Tuttnauer products through the TDA Perks website, it would pull its product line from IQ.  IQ alleges that this threat was made under pressure from Schein.

- At a November 2015 New York dental association trade show, IQ displayed products manufactured by Air Technique Imaging ("ATI").  A representative from ATI directed IQ to remove the display, because he was "getting grief" from representatives from two different companies, which IQ later identified as Schein and Patterson, who were unhappy that ATI had permitted IQ to distribute its products.  As a result, IQ claims that it had to stop promoting ATI's products at its booth.

- In 2016, a manager from KaVo Kerr, a major dental products manufacturer, told IQ that a Patterson representative had asked him to pull his products from IQ because of IQ's sale of products through TDA Perks Supplies.

IQ also alleges four occasions when manufacturers declined IQ's request to be a dealer for their product lines. One occurred in 2013; the rest in 2016. The complaint makes clear that at least three of these manufacturers had pre-existing distribution relationships. IQ alleges that each of these manufacturers declined IQ's proposals under pressure from one or more of defendants.

Turning to IQ's allegations of defendants' boycotts of SDAs, IQ claims that defendants coordinated and agreed to threaten and implement boycotts of SDAs that worked with SourceOne by skipping those SDAs' respective trade shows. The aim of these alleged boycotts was to punish SDAs that had partnered with SourceOne and simultaneously dissuade other SDAs from doing so. Trade shows contribute a substantial portion of SDAs' income. Historically, all three defendants had attended such shows. IQ claims that the alleged boycotts deterred many SDAs from sponsoring their own SourceOne websites, which limited the platform's growth, and, in turn, stifled IQ's profits.

IQ alleges that defendants specifically targeted trade shows in Texas and Arizona. IQ claims, for instance, that in October 2013, regional managers from Schein and Benco had a phone call, memorialized in an email, in which they discussed their shared interest in not attending the TDA trade show after the TDA launched its SourceOne affiliated site. The managers discussed reaching out to their counterpart at Patterson to get his support.

As to the AZDA trade show, IQ points to a July 2014 email from a Benco to a Patterson employee, stating, "[w]e are of the same mindset. It would be gratifying to see every distributor

with a local presence make a unified statement on the AZDA's ill-conceived idea" to work with SourceOne.  In another email that same month, a Benco employee wrote to a manufacturer, "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year."

IQ also alleges that defendants pressured manufacturers to boycott the trade shows.  IQ claims, for instance, that in March 2014 dental vendors reported that they were told by both Patterson and Schein to avoid TDA Perks, or risk Patterson and Schein "shelv[ing] their products nationwide."  IQ also points to a November 2013 email in which a Schein employee wrote to a colleague about speaking with Patterson and Benco, and not giving the TDA "a dime."  The other Schein employee responded writing, "I refuse to work with any manufacturer rep that sells through [SourceOne].  That's what every distributor should say.  The manufacturers will get scared and pull out."  IQ alleges that Schein, Patterson, and Benco together "pressured dozens of manufacturers to pull out of the AZDA show."

IQ claims that as a result of this alleged conduct, other SDAs were deterred from working with SourceOne.  For example, IQ states that at a July 2014 dental meeting in Chicago, the Ohio Dental Association's representative was enthusiastic about partnering with SourceOne.  However, the representative subsequently informed SourceOne that Schein and Patterson had threatened to "take action against the Ohio Dental Association if it proceeded with a SourceOne website."  The partnership fizzled.  According to IQ, the Virginia Dental Association, Colorado Dental Association, and Louisiana Dental Association all decided not to partner with SourceOne after considering the risk that doing so would jeopardize their relationships with defendants.

On the other hand, the Nevada Dental Association did launch a SourceOne website, and IQ argues that it did so because it does not put on a trade show, and thus had less exposure to

defendants' retaliatory pressure.  IQ concedes that recently, SDAs in Florida and Georgia have launched SourceOne sites, but claims that defendants have already inflicted their intended damage.

As the final prong of the conspiracy, IQ also alleges that defendants boycotted dentists who purchased dental supplies through SourceOne websites and from IQ by withholding essential maintenance services for those dentists' equipment.

In addition to defendants' three alleged anticompetitive attacks on SourceOne described above, IQ also describes an allegedly long-standing campaign (since at least as early as 2005) among defendants to fix the prices in the dental products market, with the aim of maintaining supracompetitive margins.  IQ alleges that defendants' margins – purportedly at 35% or higher – are well above what would obtain in a competitive market, and that defendants worked to exclude from the market distributors willing to sell manufacturers' products at a lower margin.

To that end, IQ claims that when distributors willing to work at lower margins approached manufacturers to sell their products, the manufacturers reported that they had to decline to sell to them in the face of pressure from defendants.  IQ alleges that absent coordinated conduct by all defendants, the price fixing would not have worked, as the manufacturers could simply have shifted their sales to another distributor.

IQ's allegations on this point are based in large part on a June 2008 meeting between sales representatives of distributors Archer & White and Dynamic Dental, which were attempting to sell products at a lower margin but which were allegedly stymied by a defendant-driven manufacturer boycott, led by Schein and Burkhart Dental Supply Company.  At that meeting, the Schein and Burkhart representatives allegedly "offered to end the group boycott of Archer & White and Dynamic Dental" if both "agreed to maintain margins on the sales of their

dental products between 32% and 34%, the then-prevailing margin" allegedly maintained by defendants.

In addition to this alleged anticompetitive conduct, IQ also claims that defendants engaged in a campaign to falsely disparage SourceOne and IQ and their products and services. IQ claims that defendants have misrepresented products sold by IQ as expired, counterfeit, altered, sold through unauthorized distribution channels, or otherwise unfit for their intended purpose. IQ claims that defendants made these comments to discourage dentists from buying from IQ.

As discussed above, IQ describes that its relationship with SourceOne entails it conducting its transactions, filling received orders, and shipping sold products directly to the dentists, without SourceOne's involvement beyond listing the goods on its sites. IQ pays SourceOne a commission on each sale. Since May 2014, IQ has sold approximately 90% of products sold on SourceOne's sites. IQ claims that but for defendants' conduct, the SourceOne platform would have spread nationwide, and, in turn, IQ's sales through the platform's various sites would have increased exponentially.

In 2015, SourceOne filed suit in this Court against Schein, Patterson, and Benco, alleging, *inter alia*, unlawful restraint of trade under the Sherman Act. SourceOne claimed that the three entered into a conspiracy to prevent its emergence as an effective competitor in the distribution and sale of dental supplies. Specifically, SourceOne alleged that Schein, Patterson, and Benco conspired to:

- boycott the TDA and AZDA after each association named SourceOne as an endorsed vendor of dental supplies;

- pressure other SDAs from entering similar agreements with SourceOne;

- pressure manufactures not to attend SDA conventions;

- pressure manufactures and other distributors not to provide products to SourceOne; and

- deny services to dentists who did business with SourceOne.

SourceOne alleged injury to itself and to competition and consumers. SourceOne has settled with Schein; Patterson and Benco currently have motions for summary judgment before this Court.

## DISCUSSION

IQ argues that defendants' alleged group boycott constitutes unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 et seq.; and the New Jersey Antitrust Act, N.J.S.A. §§ 56:9-1 et seq ("NJAA"). IQ also alleges state law tort claims.

### A. Antitrust Standing

An antitrust plaintiff has to meet not only the familiar requirements of constitutional standing, but must also demonstrate at the pleading stage that it satisfies "antitrust standing." See Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 436-37 (2d Cir. 2005). "This standing requirement originates in the Supreme Court's recognition that, although Section 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages, Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Id. Instead, the antitrust laws are intended to provide a remedy for "injuries reflecting an anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." In re London Silver Fixing, Ltd., Antitrust Litig., 213 F. Supp. 3d 530, 550 (S.D.N.Y. 2016) (internal quotations omitted).

Accordingly, the Supreme Court has identified several factors to determine whether a plaintiff has antitrust standing.  See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters 459 U.S. 519, 529, 103 S. Ct. 897, 904 (1983).  The Second Circuit "has distilled these factors into two imperatives: we require a private antitrust plaintiff plausibly to allege (a) that it suffered a special kind of 'antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76 (2d Cir. 2013) (internal quotations omitted).  IQ does not satisfy either imperative.

### 1.  Antitrust Injury

An "antitrust injury" is "an injury attributable to the anticompetitive aspect of the practice under scrutiny."  Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 122 (2d Cir. 2007).  Courts in the Second Circuit use a three-step test to determine if a plaintiff has sufficiently alleged antitrust injury.  Gatt Commc'ns, 711 F.3d at 76.

At the first step, the party asserting that it has been injured by an illegal anticompetitive practice must "identify the practice complained of and the reasons such a practice is or might be anticompetitive."  Id. (internal quotations and alterations omitted).  At this stage, the Court evaluates if the plaintiff generally alleges anticompetitive conduct.

IQ alleges that defendants engaged in anticompetitive conduct in the market for dental supplies.  That conduct allegedly included threatening manufacturers who sold through SourceOne via IQ with a boycott, threatening to boycott and allegedly boycotting various SDAs, and (although not developed in IQ's pleadings) boycotting dentists.  IQ also alleges a years-long price-fixing campaign.  The goal of this vast anticompetitive campaign was, allegedly, to force SourceOne out of business.  IQ argues that with SourceOne, a "disruptive," low-cost innovator

limited in its growth or forced out of business, altogether, consumers (dentists) would be forced to purchase through defendants, and would therefore be deprived of the choice of "high-quality" dental products at a lower cost through SourceOne.

The first step of the antitrust injury test does not require IQ to allege that it was the target or do more than it has here. Instead, IQ only has to allege that the conduct it describes is prohibited by the antitrust laws. It has met that threshold by alleging a series of boycotts designed to force a low-cost competitor out of the market, and by describing a price-fixing campaign.

At the second step, a court evaluating if an antitrust plaintiff has adequately alleged antitrust injury must identify "the actual injury the plaintiff alleges," by "look[ing] to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct." Id. (internal quotations and alterations omitted).

First, as to the price fixing scheme, IQ cannot assert injury. It is black letter law that IQ cannot claim to be a competitor of defendants and also claim to have been injured by their imposition of supercompetitive prices on the market. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582-83 (1986) ("Nor can respondents recover damages for any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price.") (internal citations omitted); Yong Ki Hong v. KBS Am., Inc., 951 F. Supp. 2d 402, 417-18 (E.D.N.Y. 2013) ("[H]orizontal price-fixing schemes are illegal under the antitrust laws only because of the harm they may cause—increased prices—to *purchasers* of the product for which

prices have been fixed." (internal quotations and alterations omitted)).  As a competitor in the same market, IQ stood only to benefit from any price increase imposed by defendants.

Second, IQ cannot claim injury arising out of defendants' alleged boycott schemes.  IQ's own complaint is fatal to it at this step.  IQ alleges that by April 2014, "[d]efendants' tactics achieved their objectives," and DDS and Arnold "terminated their relationships with SourceOne."  Thereafter, "SourceOne sought a replacement supplier."  In May 2014, SourceOne approached IQ to work as its distributor, and "[a]fter brief negotiations, IQ signed a contract with SourceOne, "becom[ing] the predominant seller on the Websites."  Step two of the injury analysis requires IQ to claim that it was put in a "worse position" as a consequence of defendants' conduct.  But IQ admits that it only secured a potentially lucrative contract with SourceOne *because of defendants' alleged anticompetitive conduct*.  The moment IQ made *a single sale* through SourceOne, it was in a better position than it otherwise would have been.

IQ, therefore, cannot plausibly assert that defendants' conduct prevented it from making as many sales through SourceOne as it otherwise might have; but for defendants' conduct, IQ would have made *no* sales through SourceOne, as DDS and Arnold would presumably still be SourceOne's distributors.  Ironically, IQ benefited from defendants' allegedly anticompetitive conduct.

Accordingly, IQ has not alleged an antitrust injury, and the Court need not reach the third step of analysis, which would require determining if IQ's alleged injury flowed from the alleged anticompetitive scheme.[1]

---

[1] IQ claims that antitrust standing by virtue of being a competitor of defendants and having suffered an antitrust injury.  As a threshold matter, because IQ has not adequately alleged that it suffered an antitrust injury, this argument fails.  However, even if IQ had alleged an antitrust injury, the case law does not stand for the proposition that antitrust standing follows antitrust injury as a matter of course.  "[T]he Second Circuit has made clear [that] the notion that competitors have antitrust standing is 'oversimplified.'"  Int'l Bus. Machines Corp. v. Platform Sols., Inc., 658 F. Supp. 2d 603, 610 (S.D.N.Y. 2009).  Indeed, "a private antitrust plaintiff's status as a competitor is not

## 2. Efficient Enforcer

Even if IQ had alleged an antitrust injury, it could not demonstrate that it meets the second requirement for antitrust standing by showing that it would be an "efficient enforcer" of the antitrust laws.  See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006) ("Even if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing."); Balaklaw v. Lovell, 14 F.3d 793, 798 n.9 (2d Cir. 1994) ("[A]n antitrust injury, while necessary to establish standing under section 4 of the Clayton Act, may not always be sufficient to confer standing, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." (internal quotations omitted)).  On this basis alone, IQ lacks antitrust standing.

To determine if a plaintiff is an "efficient enforcer," courts look to:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Id.

The weight given to each factor is case-specific.  See Daniel, 428 F.3d at 443 ("Similarly, the weight to be given the various factors will necessarily vary with the circumstances of particular cases.").  However, the first factor (the directness or indirectness of the asserted injury), "must be met in every case."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1392 (2014).  "The purpose [of the efficient enforcer analysis] is to ensure that the

---

dispositive."  Dentsply Int'l Inc. v. Dental Brands for Less LLC, No. 15 CIV. 8775, 2016 WL 6310777, at *3 (S.D.N.Y. Oct. 27, 2016) (internal quotations omitted).  Courts in the Second Circuit "can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges."  Port Dock, 507 F.3d at 122.

statute is not read so broadly that any person who has been harmed by anti-competitive conduct, however remotely or indirectly, is granted a right to sue." <u>Daniel</u>, 428 F.3d at 450.

As discussed below, IQ only satisfies the first factor, and even there, only with respect to a subset of its allegations. Therefore, each of the efficient enforcer factors weigh against it.

The first efficient enforcer factor examines whether a plaintiff would be an efficient enforcer because it suffered a direct, rather than a remote, injury. "Evaluating the directness of an injury is essentially a proximate cause analysis that hinges upon whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." <u>London Silver</u>, 213 F. Supp. 3d at 552 (internal quotations omitted). Accordingly, in evaluating proximate cause, Courts look to

> whether the injury that resulted was within the scope of the risk created by the defendant's wrongful act; whether the injury was a natural or probable consequence of the conduct; whether there was a superseding or intervening cause; whether the conduct was anything more than an antecedent event without which the harm would not have occurred.

<u>Lotes Co. v. Hon Hai Precision Indus. Co.</u>, 753 F.3d 395, 412 (2d Cir. 2014) (internal alterations omitted).

IQ alleges that it was "denied access to numerous State markets and countless new customers, and as a result lost millions of dollars of profits that it otherwise would have made," because of defendants' successful efforts to stymie SourceOne's growth. As discussed above, defendants allegedly boycotted dentists, SDAs, and manufacturers. Only IQ's claims about defendants' pressure on manufacturers describe anticompetitive conduct that is sufficiently direct.

The pressure that IQ describes defendants exerting on dentists and SDAs, on the other hand, directly targeted SourceOne. There was no intermediate link in the causal chain between

the anticompetitive conduct and effect. Instead, defendants allegedly pressured dentists and SDAs to not buy from and partner with SourceOne, respectively. When dentists and SDAs yielded to defendants' alleged pressure, SourceOne lost business (some actual and some prospective).

However, the injury that IQ allegedly suffered from this conduct was conceptually different from that suffered by SourceOne. First, IQ's harm is at least one causal step removed from SourceOne's harm: IQ was only injured when SourceOne's sales declined, so its loss was, by definition, derivative of SourceOne's and therefore remote. Second, any harm suffered by IQ is best understood as incidental to that suffered by SourceOne. IQ was (presumably in proportion to its sales) no more impacted by defendants' conduct than was any other distributor that sold through SourceOne.

IQ describes, like in Illinois Brick Co. v. Illinois, 431 U.S. 720, 746 (1977), a category of injury that is an improper basis for an antitrust suit. There, the Supreme Court held that indirect purchasers of price-fixed goods, sold at an inflated price because of anticompetitive conduct, lacked standing to bring suit against the price-fixer. Here, IQ is analogously remotely situated as to the party allegedly engaging in anticompetitive conduct, and just as in Illinois Brick, its claimed injury necessarily passes through a middle-party.

On the other hand, IQ's allegations of direct pressure on dental manufacturers gives rise to IQ's only direct injury that is not impermissibly remote. IQ identifies itself as the "fulcrum" on which defendants levered anticompetitive force against SourceOne by pressuring manufacturers. In other words, by threatening manufacturers with the loss of their business if the manufacturers continued to sell to IQ, defendants allegedly used IQ as a necessary means to harm SourceOne. Boycott pressure always involves a target; here the target was IQ. IQ's injury

was, as described, "a necessary step in effecting the ends of the alleged illegal conspiracy and the very means by which it is alleged that [defendants] sought to achieve [their] illegal ends." In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 159 (2d Cir. 2016) (internal quotations omitted). With the manufacturer aspect of defendants' alleged anticompetitive scheme – and this aspect alone – IQ has alleged conduct that does not situate IQ at too far a remove from defendants' conduct.

As to the second efficient enforcer factor, there is not just one class of other parties whose self-interest would be expected to lead them to sue, but many. Implicit in the second factor "is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced" when other, better situated parties can be expected to bring suit against the same defendants. Gelboim v. Bank of Am. Corp., 823 F.3d 759, 779 (2d Cir. 2016).

Taking IQ's allegations to be true, it is clear that SourceOne – the obvious, express target of defendants' alleged conspiracy – is the party that would be most motivated and best situated to pursue an antitrust claim against defendants. In fact, SourceOne has done exactly that, by filing a suit that is currently pending in this Court. Indeed, as defendants noted, some of the paragraphs in IQ's complaint are strikingly similar to portions of SourceOne's earlier-filed complaint. Therefore, denying IQ standing in this suit is unlikely to leave defendants' alleged antitrust violations undetected, and, if found to have occurred, unremedied.

But SourceOne is hardly the only party that would be rationally motivated by self-interest to sue defendants for exactly the same conduct alleged here. Fatally for IQ, several of these other parties are more incentivized and better situated than IQ to pursue antitrust remedies.

First, certain of the SDAs impacted by defendants' alleged conspiracy are presumably well-motivated to sue. IQ claims that trade shows are a central part of the SDA business model. Given that defendants allegedly control 80-90% of the relevant market, boycotting certain SDA shows would likely have an outsized impact on the hosting SDAs that would incentivize them to pursue legal recourse.

Second, the manufacturers that defendants allegedly directly threatened are presumably highly motivated to bring suit. As to them, IQ's allegations present a textbook case of anticompetitive pressure.

Third, the dentists who allegedly suffer the consequences of a monopolized market, with resultant higher prices (as claimed by IQ's price-fixing allegations) and less choice, would also likely be highly incentivized to bring suit.

Finally, even if they were to encounter the same difficulty with other elements of the standing inquiry as does IQ, DDS and Arnold were the distributors who sold through SourceOne who actually suffered such anticompetitive pressure that they abandoned their relationship with SourceOne. If any party in IQ's specific situation were to be well-positioned to bring a suit, it would one that actually lost a valuable contract, as opposed to the party that gained one.

The existence of each of these more directly injured groups diminishes the justification for granting IQ – a much more remote party – antitrust standing.

As to the third efficient enforcer factor, IQ alleges highly speculative injuries. Although a degree of uncertainty is expected in calculating antitrust damages, highly speculative damages are not recoverable. See Gelboim, 823 F.3d at 780; see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981) ("Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for

example, to damages resulting from a personal injury or from condemnation of a parcel of land.").

IQ's damages turn on lost business opportunities. IQ argues that thanks to defendants' conduct, it lost the profit from potential future sales that might have been made through presently nonexistent websites that SourceOne might have launched across the country in coordination with various SDAs. This theory is far too attenuated, resting on a series of tenuous and conjectural decisions that would have to be made by SourceOne, manufacturers, SDAs, dentists, and entities selling through SourceOne.

Because IQ's prospective damages are derived from "conjectural theories of injury and attenuated economic causality," any attempt at calculating IQ's damages "would mire [this Court] in intricate efforts to recreate the possible permutations in the causes and effects" of each alleged lost sale in each state and the predicate factual developments for each. Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10, 14 (2d Cir. 1980). Given the layers of necessary factual inferences that IQ's damages claims require, the Court cannot simply set aside the damages determination for a later day without first addressing the question of whether they could ever be calculated at all.

IQ would ask this Court to construct an alternate universe, in which a myriad of discrete players with their own complex motivations and decision-making calculations would have aligned to create profitable opportunities for SourceOne and IQ. It would then ask the Court to calculate how much profit it lost. Notably, the remoteness of most of IQ's injuries from defendants' alleged conduct compounds their speculative nature. The number of variables that would need to be resolved to approximate any damages calculation highlights the challenge. Any award would, at a minimum, have to take into account: 1) the number of SDAs that would

have partnered with SourceOne, and when they would have done so; 2) the commission rate that each would have demanded of SourceOne; 3) the commission rate that SourceOne would charge IQ if it expanded and increased its overhead costs; 4) the number of additional orders that would be placed in each state through SourceOne's websites, rather than from IQ's own website; and 5) the price that each manufacturer would charge IQ for its products in the future.

As it must, IQ acknowledges that its claim would require complex damage calculations. This conclusion is inescapable in light of the above analysis. IQ, however, argues that experts can later be left to resolve the issue. The Court is not convinced. The speculativeness of IQ's claimed damages militates strongly against the Court holding it to be an efficient enforcer.

Turning to the fourth efficient enforcer factor, the risk that other plaintiffs would be entitled to recover duplicative damages is significant – especially because SourceOne is already engaged in litigation against defendants, and has indeed settled with one. As the above discussion shows, SourceOne, SourceOne's distributors, manufacturers, SDAs, and dentists could all "be in a position to assert conflicting claims to a common fund." AGC, 459 U.S. at 544. Calculation of which entity is entitled to what would be rendered all the more difficult by the hypothetical nature of IQ's claimed injuries (detailed above), and by the number of variables at play. Indeed, "[i]t is wholly unclear on this record how issues of duplicate recovery and damage apportionment can be assessed." Gelboim, 823 F.3d at 780.

The balance of the efficient enforcer factors weighs decidedly against IQ. Therefore, IQ has satisfied neither prong of the antitrust standing inquiry.

### B. State Antitrust Law

IQ's allegations of defendants' violations of New York and New Jersey state antitrust laws are also dismissed because of the failure of its federal claims.

"The Donnelly Act is patterned after the Sherman Anti-Trust Act [] and is generally construed in light of federal precedent." Great Atl. & Pac. Tea Co. v. Town of E. Hampton, 997 F. Supp. 340, 352 (E.D.N.Y. 1998). The Second Circuit has held that there is "no reason…to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing." Gatt. Commc'ns, 711 F.3d at 81-82.

Likewise,

> Substantively, the NJAA is "virtually identical" to the Sherman Act, and the New Jersey legislature "intended the [NJAA] as consistent with federal antitrust law, and expressly provided that it 'be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws.'

Bocobo v. Radiology Consultants of S. Jersey, P.A., 477 F. App'x 890, 896 (3d Cir. 2012).

### C. State Law Claims

#### 1. Choice of Law

Defendants have also moved to dismiss IQ's state law claims for tortious interference with prospective business relations, civil conspiracy, and aiding and abetting. The Court has dismissed IQ's federal question claims, but it retains jurisdiction over IQ's state law claims through its exercise of diversity jurisdiction under 28 U.S.C. § 1332.

As a preliminary manner, the Court has to determine what state law applies. "Because this Court is sitting in diversity jurisdiction . . . New York choice of law principles govern." Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc., 929 F.2d 49, 52 (2d Cir. 1991).

Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).

The parties acknowledge that there is no conflict between New York and New Jersey law as to tortious interference. See Treppel v. Biovail Corp., No. 03 CIV. 3002, 2004 WL 2339759, at *8 (S.D.N.Y. Oct. 15, 2004), on reconsideration, No. 03CIV3002, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005) ("With respect to tortious interference with prospective economic advantage, the laws of New York and New Jersey are nearly indistinguishable.").

Likewise, neither party claims a conflict between New York and New Jersey law as to aiding and abetting. The parties are correct; there is no difference between the standard as applied in both states. See Ryan v. Hunton & Williams, No. 99-CV-5938, 2000 WL 1375265, at *8 (E.D.N.Y. Sept. 20, 2000) ("To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong."); Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003) ("The elements of aiding and abetting are: (1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly and substantially participated in the wrongdoing."). "Both jurisdictions look to the Restatement (Second) of Torts, which does not require wrongful intent by the third party, but only "that the third party knew of the breach of duty and participated in it." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 142 (2d Cir. 2011); See Pittman ex rel. Pittman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998); Miller v. P.G. Lewis & Assoc., No. CIV 05-5641, 2007 WL 316446, at *6 (D.N.J. Jan. 30, 2007) ("New Jersey courts have recognized

the Restatement of Torts as setting the standard for civil aiding and abetting liability."). Therefore, it is undisputed that New York law applies to each of those claims.

IQ, however, claims that New Jersey recognizes a tort of civil conspiracy, which New York does not, and that the Court should therefore conduct interest analysis and apply New Jersey law. IQ is mistaken. When confronted with this question, other courts in this Circuit have found that New York law applies.[2]

First, New York and New Jersey both treat civil conspiracy as a derivative claim: "[i]t is well settled that New York does not recognize an independent civil tort of conspiracy. While a plaintiff may allege, in a claim of fraud or other tort, that parties conspired, the conspiracy to commit a fraud…is not, of itself, a cause of action." Gorbaty v. Wells Fargo Bank, N.A., No. 10-CV-3291, 2012 WL 1372260, at *23 (E.D.N.Y. Apr. 18, 2012). As to New Jersey: "[t]he same is true of New Jersey." Id.; see also Brown ex rel. Estate of Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 517, fn. 10 (D.N.J. 2002) ("Civil conspiracy is not an independent cause of action, and conspiracy liability depends on the presence of an underlying finding of tort liability."); Morganroth, 331 F.3d at 414-15 ("Mere agreement to do a wrongful act can never alone amount to a tort, whether or not it may be a crime. Some act that is itself a tort must be committed by one of the parties in pursuance of the agreement." (internal citations omitted)); Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 497 (D.N.J. 1998) ("Thus, the conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors. The actionable element is the tort which the defendants agreed to perpetrate and which they actually committed.").

---

[2] See Treppel v. Biovail Corp., No. 03 CIV. 3002, 2004 WL 2339759, at *8 (S.D.N.Y. Oct. 15, 2004), on reconsideration, No. 03CIV3002, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005) ("Consequently, New Jersey's jurisprudence [regarding civil conspiracy] is not sufficiently developed to create a conflict with the law of another jurisdiction.").

Second, once a plaintiff adequately pleads an underlying tort, New York and New Jersey analyze that plaintiff's secondary civil conspiracy claim in a substantially similar manner. In New York, "[t]o establish [a] claim of civil conspiracy, [a plaintiff] must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." World Wrestling Fed'n Entm't, Inc. v. Bozell, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001). New Jersey requires "substantially the same elements." Treppel, 2004 WL 2339759, at *8-9; see Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364, 633 A.2d 985, 998 (App. Div. 1993) ("A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage."). "New York and New Jersey do not conflict in that each requires plaintiff to establish four elements in addition to the underlying tort." Id.

Accordingly, New York state law applies to all three of IQ's state law claims.

## 2. Tortious Interference

Under New York law, "[t]o state a claim for tortious interference with prospective business relations, [a] plaintiff must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either (1) with the sole purpose of harming the plaintiff; or (2) by dishonest, unfair or improper means." S.O. Textiles Co. v. A & E Prod. Grp., a Div. of Carlisle Plastics, Inc., 18 F. Supp. 2d 232, 240 (E.D.N.Y. 1998). Such wrongful means "include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and

some degrees of economic pressure…" Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628 (1980).

A tortious interference claim requires that "the defendant . . . interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 167 (S.D.N.Y. 1998). Furthermore, "[w]here there has been no breach of an existing contract, but only interference with prospective contract rights…plaintiff must show more culpable conduct on the part of the defendant." NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc., 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581 (1996). "Conduct that is not criminal or tortious will generally be lawful and thus insufficiently culpable to create liability for interference with prospective contracts or other nonbinding economic relations." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359 (2004) (internal quotations omitted).

Additionally, "[i]f the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266, 269 (2d Cir. 1987). However, courts in this Circuit have held "that alleging violations of federal antitrust law and state statutory law should satisfy the pleading requirements for wrongful conduct." Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 334-35 (S.D.N.Y. 2003); see also Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp., No. 15-CV-05488, 2016 WL 5719790, at *7 (S.D.N.Y. Sept. 29, 2016), aff'd, No. 16-3484, 2017 WL 4176223 (2d Cir. Sept. 21, 2017). The New York Court of Appeals has also held that where "unlawful restraint of trade is effected," a competitor can be held liable for interference with prospective

contractual relations.  <u>Guard-Life Corp.</u>, 50 N.Y.2d at 191, 428 N.Y.S.2d 628.  "[E]ven absent a finding of antitrust violations, certain degrees of economic pressure may be sufficiently wrongful to compel a finding of liability based on this cause of action."  <u>Id.</u>; <u>see also</u> <u>Tech. Consortium, Inc. v. Digital Commc'ns Assocs., Inc.</u>, 757 F. Supp. 197, 200 (E.D.N.Y. 1991).

IQ alleges that defendants interfered with its prospective business relations.  Because defendants' alleged conduct targeted prospective relations and was undoubtedly intended to at least in part benefit them, IQ must plead that defendants engaged in criminal or tortious behavior.

IQ's tortious interference claim fails for several reasons.  First, although anticompetitive conduct may satisfy the requirement that IQ have suffered criminal or tortious behavior, IQ has not alleged a viable antitrust claim.  Accordingly, it has not stated underlying criminal or tortious conduct on which to base its tortious interference claim.  Second, just as antitrust standing analysis is intended, in part, to determine if a plaintiff claims injury too remote from the alleged anticompetitive conduct, a tort claim requires a similar proximate cause analysis.  For the reasons discussed above (specifically, with regard to why IQ fails the first element of the efficient enforcer analysis), IQ cannot claim that defendants proximately caused its described injuries.  To state a claim for tortious interference, IQ must allege instances of *direct* interference with its business relations, and apart from its claims regarding pressure on manufacturers, IQ does not describe any instances of direct interference.  Furthermore, IQ's claims regarding manufacturer pressure can charitably be described as threadbare, at best.  Third, allowing IQ's tortious interference claim to survive defendants' motion to dismiss would undermine well-developed antitrust jurisprudence.  Courts conducting antitrust standing analysis do so to evaluate if an antitrust plaintiff is a proper plaintiff.  They must dismiss those who are not.  A significant

judicial gatekeeping function is impaired if antitrust plaintiffs found to lack antitrust standing can circumvent this threshold pleading requirement by simply bringing a parallel state tort claim. IQ, which does not meet the antitrust standing requirements, should not be permitted to allege its antitrust claims under the guise of bringing a distinct state claim.

### 3. Civil Conspiracy and Aiding and Abetting

Under New York law, IQ's civil conspiracy and aiding and abetting claims are derivative of its claim for tortious interference. Because IQ's tortious interference claim is dismissed, so are these two tag-along claims.

## CONCLUSION

IQ's antitrust claims are dismissed because it lacks antitrust standing. IQ's state law claims for tortious interference, civil conspiracy, and aiding and abetting are dismissed for failure to state a claim. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


Dated: Brooklyn, New York            _____
       December 21, 2017                  U.S.D.J.